```
              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF DELAWARE


B. BRAUN MELSUNGEN AG    )
And B. BRAUN MEDICAL,    )
INC.,                    )
                         )
          Plaintiffs,    )   C.A. No. 09-347-JJF
                         )
v.                       )
                         )
TERUMO MEDICAL           )
CORPORATION, and TERUMO  )
CORPORATION,             )
                         )
          Defendants.    )



                         Wednesday, July 8, 2009
                         3:02 p.m.
                         Courtroom 6B



                         844 King Street
                         Wilmington, Delaware


BEFORE:  THE HONORABLE JOSEPH J. FARNAN, JR.
         United States District Court Judge



APPEARANCES:

         YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
         BY:  MELANIE SHARP, ESQ.

              -and-

         KIRKLAND & ELLIS, LLP
         BY:  EDWARD C. DONOVAN, ESQ.
         BY:  GREGORY F. CORBETT, ESQ.

                         Counsel for the Plaintiffs
```

2

```
1    APPEARANCES CONTINUED:

2

3           FISH & RICHARDSON, P.C.
            BY:  DOUGLAS E. McCANN, ESQ.
4           BY:  MATHIAS W. SAMUEL, ESQ.

5
                       Counsel for the Defendants
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
1                    THE CLERK:  All rise.

2                    THE COURT:  All right.  Be seated,

3      please.

4                    (Everyone said, Good afternoon,

5      Your Honor.

6                    THE COURT:  You want to announce

7      your appearances?

8                    MS. SHARP:  Good afternoon, Your

9      Honor.

10                    THE COURT:  Good morning.

11                    MS. SHARP:  Melanie Sharp from

12     Young Conaway on behalf of the B. Braun

13     plaintiffs in this case.

14                    With me in the courtroom today are

15     my colleagues from Kirkland & Ellis, D.C., Ed

16     Donovan --

17                    MR. DONOVAN:  Good afternoon.

18                    MS. SHARP:  -- and Greg Corbett.

19                    THE COURT:  Good afternoon.

20                    MR. CORBETT:  Good afternoon.

21                    MS. SHARP:  I would also like to

22     introduce our client, the senior vice president

23     and senior counsel from B. Braun Medical, Inc.,

24     Cathy Codrea.
```

```
 1                    THE COURT:  Good afternoon.

 2                    MS. CODREA:  Good afternoon.

 3                    MR. McCANN:  Good afternoon, Your

 4      Honor.

 5                    THE COURT:  Good afternoon.

 6                    MR. McCANN:  Doug McCann of Fish &

 7      Richardson on behalf of Terumo Medical

 8      Corporation and Terumo Corporation.

 9                    With me, Your Honor, my colleague,

10      Matt Samuel from our Twin Cities office.  I'll

11      be filing a motion for admission pro hac for

12      Mr. Samuel today, Your Honor.

13                    THE COURT:  All right.  That will

14      be granted.

15                    MR. McCANN:  Thank you, Your

16      Honor, and then also with us is our client

17      representative, Gael Tisack, who is vice

18      president and corporate counsel for Terumo.

19                    And then also Earl Blackburn, who

20      is a college student, Your Honor, and an intern

21      at Terumo.

22                    THE COURT:  All right.  Welcome.

23                    MR. McCANN:  Thank you.

24                    THE COURT:  All right.  I took a
```

1    look at what's submitted and wanted to ask you a

2    couple of questions.  What's the, if any,

3    relationship between the parties?

4                    MR. DONOVAN:  Your Honor, Ed

5    Donovan on behalf of the Braun plaintiffs.

6    There's no relationship between Braun and

7    Terumo.

8                    THE COURT:  And with regard to the

9    marketplace, what are the circumstances between

10   Braun and Terumo?

11                   MR. DONOVAN:  Your Honor, in terms

12   of the marketplace for the accused device, Braun

13   sells a product in the passive IV safety

14   catheter market.  It's a market of about a

15   hundred million a year in sales.

16                   Braun has about 90 percent of

17   those sales.  Terumo, as we understand it, is

18   just now entering this year into that market.

19                   I don't know if they had any

20   substantial sales at all.  So in terms of the

21   marketplace, we have a huge portion of that

22   marketplace.  Terumo is now trying to enter that

23   marketplace for the first time in the United

24   States.

```
 1                    THE COURT:  Have the parties ever

 2     litigated before?

 3                    MR. DONOVAN:  Your Honor, the

 4     parties have litigated before outside the United

 5     States.  Outside of the United States, Terumo

 6     and Braun or a Braun entity and a Terumo entity

 7     have litigated about these safety IV catheters.

 8                    I believe in Japan.  I think

 9     there's ongoing litigation in Malaysia.  And

10     there is, I believe, at least two lawsuits in

11     Europe.

12                    Now, those may not be the same

13     products.  They are IV catheters, but different

14     countries have different types of IV products

15     depending upon the market.

16                    But there is a history of

17     litigation between as it relates to this

18     product, and it's all what could be

19     characterized as recent.

20                    THE COURT:  In other words,

21     there's no 20-year history here, 10-year history

22     of litigation between the parties.  This is

23     within the last five years?

24                    MR. DONOVAN:  I -- the last five
```

1        years, I think, would be accurate, Your Honor.

2                      THE COURT:  And in Japan, is it

3        actually a filed case?

4                      MR. DONOVAN:  My understanding, in

5        Japan there was a filed case by Braun that

6        Terumo took their product off the market and has

7        since reentered the market with a different

8        product.  So I don't understand whether there's

9        presently pending litigation in Japan.

10                     THE COURT:  You said there were

11       two other European countries?

12                     MR. DONOVAN:  Malaysia.  One of

13       the Braun entities has sued Terumo and that's

14       ongoing in Malaysia.  And I believe there is

15       ongoing litigation, it may have been resolved,

16       but I still believe there's ongoing litigation

17       in two countries in Europe.

18                     I think Germany is one of them,

19       and I don't recall off the top of my head the

20       second one.

21                     THE COURT:  Now, in the cases or

22       where other litigations that have occurred

23       between the parties, have they compromised any

24       of them, or have -- or any other arrangements

1    before it was litigation?

2                 I mean, has there ever been

3    agreements between the parties relative to the

4    business?

5                 MR. DONOVAN:  In Japan, there has.

6    There was an agreement between the parties to

7    settle that case.  That agreement, at least my

8    understanding, I believe is the case, that

9    agreement involved them removing the product

10   from the market.

11                There have been settlement

12   negotiations between the parties.  There's

13   probably ongoing settlement negotiations between

14   the parties.

15                But it's my understanding

16   everything else is still pending and has not

17   been resolved by compromise.

18                THE COURT:  So would I be

19   presumptuous if I thought that maybe Braun is

20   open to licensing?

21                MR. DONOVAN:  I do not believe

22   that Braun would be open to licensing in the

23   United States market for the IV catheters.  They

24   would be open to settlement, but the most

1        important market for safety IV catheters,

2        disposable catheters on your arm is the U.S.

3        They have a very large marketplace.

4                    And they're not -- they would be

5        open to settlement, but not in terms of

6        licensing their product to sell in the United

7        States.  They'd like them out of the market.

8                    If there's another way to resolve

9        the differences, they are open to it and

10       probably are discussing that.

11                   THE COURT:  I have some experience

12       with these catheters.  Matter of fact, I think I

13       still have an arm back there in the closet.

14       Fake arm.  I'm not sure.

15                   But what I want to know is:  This

16       is a market that Braun, by its intellectual

17       property, wants to manufacture and protect?

18                   MR. DONOVAN:  Yes, it does.

19                   THE COURT:  Okay.

20                   MR. DONOVAN:  The safety IV

21       catheter -- I think Your Honor had experience

22       with safety IV catheters before BB and DAJ.

23       These are passive IV catheters.

24                   You pull it out and a clip

1    automatically goes on the end.  They've been

2    protecting this market for a long time in the

3    passive safety IV catheters with their patents.

4    And they would like to continue to protect them.

5                      They're open to settlement

6    discussions, but they want the U.S. market.  And

7    they would like to have Terumo out of that U.S.

8    market.

9                      THE COURT:  Okay.  Anything that

10   you'd add to what I've been told already?

11                      MR. SAMUEL:  Your Honor, Matt

12   Samuel for Terumo.  Generally, I agree.

13                      If I can just clarify a couple of

14   things for the Court.

15                      The other place where litigation

16   was pending, but has been resolved is Australia.

17   So there's litigation in Australia and Japan

18   that's been resolved.

19                      There's ongoing litigation in

20   Malaysia and in Belgium.  So that clarifies a

21   little bit for the Court.

22                      THE COURT:  Okay.

23                      MR. SAMUEL:  Beyond that, I don't

24   have anything at this point unless the Court has

1       questions.

2                   THE COURT:  Well, I'm going to get

3       back to Braun.  Let me ask you a question:  What

4       is your client's most important consideration

5       here, noninfringement or attacking the patents?

6       Of validity, I should say.  When I said

7       attacking, I didn't mean to use that word in

8       that sense, but --

9                   MR. SAMUEL:  I understand.  But

10      based on what we've studied and seen to date, we

11      think there are several clear, non-infringing

12      issues for this patent.  On the invalidity side,

13      as you may have sensed, there's quite a history

14      here.

15                  There's a very sizeable family

16      that Braun has been prosecuting and done a lot

17      of work with the Patent Office.  Also, a lot of

18      patents overseas.

19                  We, frankly, have not yet

20      formulated final opinions on that.  We are

21      studying that very diligently and looking at

22      that.

23                  So it would be premature at this

24      point for me to tell the Court we think this

1    patent is invalid.  We certainly think there's

2    some rocks that need to be looked under and

3    studied.

4                    THE COURT:  But you certainly

5    think you don't infringe --

6                    MR. SAMUEL:  Correct, Your Honor.

7                    THE COURT: -- based on the claims

8    now?

9                    MR. SAMUEL:  Absolutely.

10                   THE COURT:  Okay.  Anything else

11   you want to tell me?

12                   MR. SAMUEL:  Nothing, Your Honor.

13                   THE COURT:  Okay.  Well, you have

14   the good fortune of -- I say that seriously --

15   of falling within this little experiment that

16   myself and Judge Stark are conducting for 10 or

17   15 cases.  And the reason why we have the

18   clients here is because we're particularly

19   interested in doing these patent case trials.

20   And the word in -- the actual word in the

21   federal rules is inexpensively and efficiently.

22                   And that's what we're interested

23   in trying to achieve.  And I know the lawyers

24   are and they make those attempts.

1          And so as I was looking at this

2     case, and I had a few questions which I've

3     gotten answered, it seems to me that what we

4     need to do is focus on infringement issues and

5     validity issues, and put everything else on the

6     back burner and save you some money.

7          No sense in getting into all of

8     that if it's really -- I mean, we may have to

9     get into it, and we all understand that, but get

10    you focused on what appears in the first

11    instance, whether there is infringement or not,

12    and then whether or not if there is found to be

13    infringement, whether the patents can withstand

14    a validity challenge.

15          That having been said, any

16    scheduling order on issues that can be focused

17    on in those two areas ought to be able to get to

18    trial.  Both sides have picked well resourced

19    law firms.

20          I'm always happy to mention that

21    those well resourced law firms are coming up

22    against a sole practitioner with one associate,

23    that being myself.  But it seems to me -- by the

24    way, for the local lawyers, at least we're still

1       on King Street, which is where I started.  Looks

2       like where I'm going to end.

3                       We ought to be able to get you to

4       trial if you want to get to trial, and you've

5       budgeted your case anywhere from 12 to 18 months

6       in a case like this.  Once the plaintiffs --

7       what's the plaintiffs' thought?

8                       MR. DONOVAN:  Your Honor, from the

9       plaintiffs' perspective, that all sounds very

10      reasonable.  The earlier the better.

11                      What Braun's bottom line is,

12      they'd like to have an injunction.  I mean, this

13      is not that different from the case of a

14      pharmaceutical-type case where somebody has a

15      patent and they have a big or all of the market,

16      and someone is trying to come in.  They're

17      selling into our accounts now at a lower price.

18      We'd like to get them out.

19                      So from the Braun perspective, if

20      we can have a trial focused on the liability so

21      we can get to an injunction, that's the most

22      important thing from Braun's perspective.  Not

23      the damages that could come from a follow-on

24      trial.

```
1              So we would be certainly ready,

2     willing and able to work with counsel and have

3     the earliest possible trial date.

4              MR. SAMUEL:  Your Honor, Matt

5     Samuel again for Terumo.  We fully agree that

6     bifurcation here makes sense, and bifurcating

7     both discovery and trial on damages and

8     willfulness is the right thing to do.

9              We propose 15 months to go to

10    trial.  It's in the middle of what you

11    recommended.  We think that's reasonable, Your

12    Honor.

13             I do a lot of work with Japanese

14    clients.  There are certainly logistical

15    difficulties and things that take longer dealing

16    with them.

17             The other issue is there is a lot

18    to look at on the invalidity side.  And we'd

19    like some time to do that.

20             Frankly, we'd like some time to do

21    that before we are proposing claim constructions

22    and Markman.  You'll see in the competing dates

23    that's why we have proposed a Markman hearing

24    still relatively quickly, but in January as
```

1    opposed to, I think, October for B. Braun.  But

2    generally we fully agree with you.  We think 15

3    months is doable.  And we will dig in and get it

4    done if the Court sets a schedule like that.

5              THE COURT:  Okay.  I said 12 to 18

6    months.  I was referencing from the filing date,

7    which is May of '09.

8              I'm going to put you at a July

9    2010 trial date, which is a little bit towards

10   the 15 months, a little bit away from the 12

11   months.  But I think it's a reasonable target

12   date.

13             Are the parties interested in

14   waiving a jury trial and having a bench trial?

15             MR. DONOVAN:  Your Honor, Ed

16   Donovan for B. Braun.  We would be willing to

17   waive a jury trial and have a bench trial if we

18   could get an earlier trial date.  And if there's

19   a way we could get it earlier than July, that

20   would be terrific, too.

21             In terms of the prior art, the

22   parties have been in litigation for a long time.

23   This patent has been submitted.  All the prior

24   art, to the extent we were aware of it at the

1     time, it was prosecuted.  So we're pretty far

2     along.

3              The parties are pretty reasonable

4     in discovery.  Neither party wants to take tons

5     and tons of discovery, if you look at the

6     proposal.

7              So just -- I don't mean to test

8     your patience, but if there was an opportunity

9     for a trial date earlier than July, we'd be

10    perfectly happy to do it in a bench trial

11    consistent with Your Honor's schedule to get to

12    an earlier trial date.

13             Thank you.

14             MR. SAMUEL:  Your Honor, thank

15    you.  I was surprised on that one and B. Braun.

16             The short answer is, Your Honor, I

17    have not discussed this with Japan as much as I

18    would like to.

19             THE COURT:  You don't have to tell

20    me today, then.

21             MR. SAMUEL:  Yeah.  I would be

22    happy to get back to the Court.  And I

23    appreciate that.

24             THE COURT:  Let me say, just so

1    we're clear here, I'm not offended if you pick a

2    jury trial.  As everybody in the room knows,

3    that's less work for me.  A lot less.

4              So, but, again, this is part of

5    what we're studying to see how expeditiously,

6    obviously, you can do some things.  If it's a

7    bench trial, that is less expensive and maybe

8    more efficient.

9              Or you can -- because you can roll

10   Markman into the trial, for instance.  And so it

11   saves a little bit of money there.

12             But I'm not offended if you get

13   back to us.  I just want to offer it and then

14   get a decision, so we can put that on our little

15   chart of issues we're approaching with the

16   attorneys and the parties.  So let us know in

17   about two weeks.

18             MR. SAMUEL:  Absolutely.

19             THE COURT:  Because it won't

20   affect the early part of discovery.

21             MR. SAMUEL:  Thank you, Your

22   Honor.

23             MS. SHARP:  Your Honor, may I ask

24   a couple of questions?

```
1              THE COURT:  Sure.

2              MS. SHARP:  As Mr. Donovan

3    explained, the issue of primary importance to

4    the Braun plaintiffs is securing injunctive

5    relief.  So we are interested, if the Court were

6    at all able to accommodate it, in exploring a

7    bench trial if Your Honor has earlier dates.

8              So if Your Honor has any

9    information, we'd be happy to take that into our

10   consideration.

11             THE COURT:  We can accommodate

12   almost any date, because we can split trial

13   dates -- trial days.  I'm sorry.  And

14   particularly when it's a bench trial, you don't

15   have the concerns of a jury and coming back and

16   forth.

17             But I -- to go to a bench trial, I

18   have to have both parties' consent.  So I am

19   just going to put that off.  But, yeah, there is

20   time in the schedule to fit whatever we need to

21   fit in.

22             MS. SHARP:  And the other issue

23   would be making sure, particularly if there is

24   separation of the issues, that the injunctive
```

```
1     relief is heard in conjunction with the

2     liability phase.

3                THE COURT:  Well, we're not --

4     yeah, absolutely.  What would happen is that

5     there would be the liability trial and followed

6     by a Justice Thomas injunction hearing where we

7     would apply the four equitable principles and

8     get an answer.

9                And defendants know Chief Justice

10    Roberts in his part of the opinion quickly

11    added -- and basically there is kind of a rule

12    for injunctions.  So defendants know once

13    particularly the plaintiff is stalking an

14    injunction, they're probably -- unless you fall

15    under Justice Kennedy's patent rule exception,

16    you're kind of dead meat in the Federal Courts.

17    It looks like to me any way.

18                So we would do it right

19    afterwards.  I mean, it's an injunction hearing.

20    It's not a lot going on.  You just have to put

21    evidence on to the four factors.

22                MS. SHARP:  And I hope I'm not

23    talking out of turn.  As Your Honor knows, we're

24    coming up to speed on the case.  And it's a
```

1    straight forward patent.

2           There aren't complex issues.

3    There should not be an elaborate or extensive

4    Markman process, and particularly in the context

5    of bifurcation of issues.

6           I think our client's interest

7    would be to accelerate that portion of the trial

8    as much as the Court can accommodate.

9           THE COURT:  Yeah.  Just let me

10    give you this caveat.

11           To really expedite or accelerate

12    requires both parties' consent.  If not, then

13    you know, in fairness, although we're focused on

14    efficiency and inexpensiveness, you have to

15    accommodate the interest of justice also under

16    Rule 1 and Rule 16.  So that sounds like that's

17    where we are in this case, at least on the

18    procedure we're going to follow.

19           We may or may not have both

20    parties' consent.  But if you don't, you know

21    that you're basically facing a July 2010 date.

22           MS. SHARP:  Understood.  Thank you

23    for the clarifications.

24           THE COURT:  But we could start the

1    trial tomorrow if it's a bench trial.  It always

2    amazes me.

3              Did you ever think about that?

4    Mr. McCann is going to love this.  I love going

5    to courthouses when you visit cities.

6              There's never anybody in them

7    after five o'clock, yet we have a crunch.  I

8    don't know why that is.

9              But law firms, your lights are on.

10   It's that economic collision, I guess.  I don't

11   know.  But you'll get back to us and let us

12   know.

13             Now, since you don't have an

14   agreed upon order, I'm going to require you to

15   submit in camera, not part of the docket, a

16   letter which is not shared with the other side,

17   but which each side sets forth what you've spent

18   to get to the Rule 16 conference, and in actual

19   expenditure of dollars, and what your client has

20   budgeted for this case to a trial.

21             And in this case, we'll include

22   the injunction hearing since that will -- if

23   there's infringement found -- will be on the

24   heels of the trial.  So we ought to know that

1    number.

2              And we're going to take a look at

3    that number at the end of the case, wherever it

4    resolves, and if you could get that to us again

5    in the next two weeks.

6              Now, you have a lot of issues to

7    iron out.  You're going to be assigned, as part

8    of this study group, to Judge Stark for

9    discovery disputes, which he'll be contacting

10   you probably within the next 30 days to come in

11   and see him.  He's going to, because they will

12   implicate his work with you through some of the

13   disputes you have about ranges of discovery.

14             And he'll have the information

15   that you gave me today along with some

16   additional information he'll request from you.

17   And he'll put you on a course that will get your

18   discovery finished so you have time to be ready

19   for the July 2010 trial date.

20             Now, since you're getting assigned

21   to a magistrate judge for your discovery, what

22   I'll call pretrial proceeding, you're going to

23   have to retain a mediator.

24             As I've explained, the other

1    cases, you can't have both utilized with the

2    resources of the Court.  The less expensive for

3    parties is the retention of a mediator for

4    compromise and settlement discussions.

5              I'm going to require you to have

6    one of those available to you within 30 days of

7    today.  And then Judge Stark is going to give

8    you the benchmark for reporting to him on

9    whether you've met.

10             It will probably be 45 to 60 day

11   intervals whether you've met and whether you've

12   made progress.  We're trying to -- I'm sure as

13   the clients are well aware, it's good, if it's

14   in your interest, to compromise a case 60 days

15   before trial or 30 days before trial because

16   there are some savings.

17             But it's a lot more inexpensive to

18   compromise a case in the middle of fact

19   discovery.  And what we think is occurring,

20   we're not directing enough effort here toward

21   that in the early part of discovery.

22             So, again, the parties have to do

23   it.  We're not going to hammer you because our

24   job is to get you to a trial.  We want to be

1      sure that you are aware and taking opportunities

2      to try and settle the case from the very

3      earliest stages of the case right up until the

4      commencement of the trial.

5                      So you'll have that mediator.

6      That mediator will work with you to try and

7      settle or compromise.

8                      And it will be on a schedule that

9      Judge Stark will provide you that you'll report

10     to him.  Now, you may report we have a mediator,

11     but we couldn't get both parties' consent to

12     settle.

13                     That's fine.  I mean, to meet, to

14     discuss.  That's fine.

15                     But then we can check that box at

16     our 60-day interval.  And we're happy that we

17     did all we could do at 90 days.

18                     You may be willing to meet. That's

19     fine.  But you may have no progress.  That's the

20     reporting we want for our statistics.

21                     Do you have any questions about

22     any of those matters for the plaintiff?

23                     MR. SAMUEL:  Just one, Your Honor.

24     I recall from looking at some of the prior

1    scheduling transcripts, is there a list of

2    mediators the Court recommends or prefers?

3           THE COURT:  Well, we have a list

4    that we use for special masters, and that's

5    available.  It's mostly -- we try to do them in

6    turn unless there's a conflict.

7           And I think the next person up, I

8    talked about it yesterday or today is Judge

9    Bechtel.  Former Judge Bechtel.  He's in the

10   District of Eastern Pennsylvania.

11          And we -- so there is a list.

12   There's special masters.

13          We're also using them for cases

14   where we appoint them to handle the discovery

15   disputes.  But what I don't want is the same

16   person doing discovery disputes that's doing the

17   mediation.

18          MR. SAMUEL:  Understood.

19          THE COURT:  But there is a list.

20   It's in the Clerk's Office.

21          And we also are advising people

22   that our Chancery Court, which has a lot of

23   business experience, is trying to get into

24   that.  I think they're willing to do this.  They

1      have a pretty good fee, though, I think.

2                    Do you know what that fee is?

3                    MS. SHARP:  Your Honor, I don't

4      know off the top of my head, but there is a

5      statutory fee involved.

6                    THE COURT:  I thought it was like

7      $5,000 a day.

8                    MS. SHARP:  I was thinking 2,000,

9      but I could be incorrect.

10                    THE COURT:  2,000.  It's not like

11     $100 an hour like we're getting here.  It's a

12     pretty good number.

13                    But in that Chancery Court is a

14     Vice Chancellor Parsons who is doing -- has done

15     some cases, patent cases from this Court.  But

16     he also has a patent litigation background.

17                    He was a patent attorney, and I

18     think he has like a science degree in something

19     like engineering.  And he's also been doing some

20     mediation for the Federal Circuit.

21                    So I just give you that that

22     name --

23                    MR. SAMUEL:  Thank you.

24                    THE COURT:  -- along with our list

1          or anybody you can agree on?

2                    MR. SAMUEL:  All right.  Thank

3          you, Your Honor.

4                    THE COURT:  Is that helpful?

5                    MR. SAMUEL:  Yes.

6                    THE COURT:  We more focus on who

7          we put in, so we're hoping we're not, you know,

8          on a wheel kind of rotating them except for

9          conflicts on the special masters' assignments.

10                   I think there's five or six on

11         that list.  You know, when we're done this

12         study, we are going to go to a -- like we have

13         for the bankruptcy appeals, we are going to go

14         to a mediation, which is separate, because it

15         might be a different talent set, skill set.

16                   But we haven't done that yet.  In

17         this district, everybody has used Judge Thynge.

18         And that's not going to work anymore with the

19         volume of her being the only person, so...

20                   Plaintiffs have any questions?

21                   MR. DONOVAN:  No, Your Honor.

22                   THE COURT:  Okay.

23                   Let me just make sure I've gone

24         down -- on the question of the Markman hearing,

```
1        I'm going to hold off on that date until I hear
2        from defendants about a jury or bench trial.
3        And actually, you know what I'll do, I think I'm
4        going to allow that to be set by Judge Stark as
5        part of his work through the scheduling order.
6        And then he'll just check with me.
7                    I'll pretty much do it whenever he
8        puts it in place, unless it's my birthday.  So
9        that will wrap that up.
10                   Okay.  I think we've covered
11       everything.  You've got a trial date.  You've
12       got Magistrate Judge Stark.
13                   He's going to work through your
14       disputes on a scheduling order.  You're going to
15       tell us whether you want a bench or jury trial,
16       and whether there's room to move it up.  And
17       we'll move it to a date convenient for
18       everybody.
19                   Because with a bench trial, we
20       have a lot of flexibility.  And you have got to
21       be working on getting a mediator, so you can
22       tell Judge Stark who that is when you meet with
23       him.
24                   Any questions?
```

1              MR. DONOVAN:  No, Your Honor.

2     Thank you.

3              MR. SAMUEL:  No, Your Honor.

4     Thank you.

5              THE COURT:  Okay.  Thank you very

6     much.

7              MS. SHARP:  Thank you, Your Honor.

8              THE CLERK:  All rise.

9              (Court was adjourned at 3:31 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1    State of Delaware )
                        )
 2    New Castle County )

 3

 4

 5                    CERTIFICATE OF REPORTER

 6

 7          I, Heather M. Triozzi, Registered

 8    Professional Reporter, Certified Shorthand Reporter,

 9    and Notary Public, do hereby certify that the

10    foregoing record, Pages 1 to 31 inclusive, is a true

11    and accurate transcript of my stenographic notes

12    taken on July 8, 2009, in the above-captioned matter.

13

14          IN WITNESS WHEREOF, I have hereunto set my

15    hand and seal this 8th day of July, 2009, at

16    Wilmington.

17

18

19          _____

20          Heather M. Triozzi, RPR, CSR
            Cert. No. 184-PS

21

22

23

24
```